SEALED

# UNITED STATES DISTRICT COURT

for the

Eastern District of California



FILED

OCT 0 5 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Miscellaneous documents and electronic devices )
obtained from the United States Probation Office relating )
to Gloria Giannini and Clifford Brigham )

Case No. 1: 1 8 SW   0 0 3 9 4 EPG

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A, attached hereto and fully incorporated herein.

located in the _____Eastern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, attached hereto and fully incorporated herein

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1343 | Wire Fraud |
| 18 USC 1344 | Bank Fraud |
| 18 USC 1028 | Identity Theft |

The application is based on these facts:
See attached affidavit, attached hereto and fully incorporated herein.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Steven Kornaros, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __10/5/18__

_____
*Judge's signature*

City and state: Fresno, CA

Honorable Erica P. Grosjean, US Magistrate
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS**

I, Steven Kornaros, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

1.  I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since April 11, 2011.  I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  I am presently assigned to working a variety of criminal matters including the investigation of fraud and civil rights violations.  I am currently assigned to the Sacramento Division, Central Valley Financial Crimes Task Force of the FBI.

2.  This affidavit is submitted in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure for evidence of violations of Title 18, United States Code, Section 1343 (Wire Fraud).  The application seeks authorization to search miscellaneous documents, electronic devices, and 7 cellular phones provided to the FBI by the United States Probation Office (USPO).  Per USPO, the aforementioned items were obtained by USPO during an authorized probation search of the residence of both Gloria Giannini (hereafter Giannini) and Clifford Brigham (hereafter Brigham).  Additionally USPO voluntarily received documents attributed to Giannini from Helena Tucker (hereafter Tucker).  Tucker is the daughter of John Skordoulis (hereafter Skordoulis).  Skordoulis is Giannini's recently deceased fiancée.  Giannini left items at Skordoulis' condo that Tucker thereafter obtained following Skordoulis' death when the condo came into Tucker's possession.  The above items are described with particularity in Attachment

1

A, attached hereto and incorporated herein by this reference. Together, the "USPO Materials." As set forth below, I have probable cause to believe that evidence, set forth in Attachment B, which is attached hereto and incorporated herein by this reference, is currently located within the USPO Materials.

3. USPO conducted the search because both Brigham and Giannini were on supervised release following convictions for fraud offenses. Each was restricted from certain types of financial transactions and employment. USPO's search focused on obtaining materials relevant to these conditions.

4. Subsequent to USPO's seizure of documents, USPO filed petitions alleging violations of Brigham's supervised release in two different cases, 1:17-cr-308 and 1:17-cr-309. Brigham admitted certain violations and in April 2018 was sentenced to a total of 60 months of imprisonment. On May 3, 2018, Chief District Judge O'Neill issued an order authorizing the release of the USPO Materials seized from Brigham to be released to the FBI.

5. USPO also filed a petition alleging that Giannini was in violation of her supervised release in case number 1:18-cr-11. Giannini also admitted certain violations and was sentenced to 24 months of imprisonment. On May 11, 2018, District Judge Drozd issued an order authorizing the release of the USPO Materials seized from Giannini to the FBI.

6. The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including USPO, FBI employees or contractors, interviews of witnesses; my review of records related to this investigation; communications with others who have knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of

establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that others or I have learned during the course of this investigation.

## Applicable Laws

7. Title 18, United States Code, Section 1343 (Wire Fraud) prohibits the following:

   a. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

8. Title 18, United States Code, Section 1344 (Bank Fraud) prohibits the following:

   a. Whoever knowingly executes, or attempts to execute, a scheme or artifice—to defraud a financial institution; or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

9. Title 18, United States Code, Section 1028(a)(7) (Identity Theft): prohibits the following:

   a. Whoever knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with any unlawful activity that constitutes a violation of Federal Law.

3

### Summary of Criminal Activity and Probable Cause

10. The FBI Investigation was initiated upon receipt of information given to the FBI by USPO. As detailed below, Giannini and Brigham had undertaken, individually and together, fraudulent schemes to defraud individuals using their bank accounts to commit wire fraud and/or bank fraud. In December of 2017, USPO discovered that Giannini and Brigham violated their federal supervised release terms prompting probation searches. These searches uncovered evidence of fraud against innocent victims consistent with the pattern of illegal activity that Giannini and Brigham had been convicted for in the past.

### Clifford Brigham

11. In April 2016, Sandra Difranco (hereafter Difranco) and Paul Brown (hereafter Brown) engaged in an investment opportunity with Brigham without having knowledge of his prior criminal record. Through their loan broker Jim Pusateri (hereafter Pusateri), Difranco and Brown loaned money to Brigham for a down payment, in order for Brigham to purchase an apartment complex located at 36 E. Saginaw Way in Fresno, CA (hereafter Saginaw). The loan contract consisted of Brown loaning Brigham $70,000 and Difranco loaning Brigham $30,000 for the Saginaw property being purchased for $540,000. In return, Brigham agreed to clean up and repair the property, collect rent, sell the property and pay Brown a total of $90,000 and Difranco a total of $39,000 within 45 days. Difranco and Brown wired the funds to a bank account associated with Brigham. Brigham later requested a 45-day extension for repayment for a total of 90 days. Although Brown and Difranco authorized this extension, Brigham never returned the money.

12. In fact, at the time he asked Difranco and Brown for money to purchase the Saginaw

4

property, Brigham already owned and controlled it. Difranco and Pusateri later discovered through title searches, that it appeared that CCC National Investment LLC (hereafter CCC) purchased the Saginaw property for $340,000 on or around March 3, 2016, a month prior to Brigham requesting funding from Difranco and Brown for the same property. Title records revealed that CCC then sold the Saginaw property to Genesis Capital Funding LLC (another entity controlled by Brigham) for $540,000 on or around May 2, 2016. Chase Bank records show that Brigham was the main signatory for the bank account of "Genesis Capital Funding LLC, DBA CCC National Investments," which was the sole account discovered to date for CCC.[1]  Given that the account mentioned both Genesis Capital and CCC, and that Brigham controlled the account, it appears that Brigham sold and purchased the property from himself.

13. Brigham's control of the Saginaw property is further reinforced by the flow of funds regarding the second sale in May 2016. Bank records indicate that Fidelity National Title Company paid CCC approximately $57,000 pursuant to the sale. Brigham signed that check and it was deposited in the CCC account on May 20, 2016. The next day, Brigham wrote a check for $56,000 on the CCC account to another account associated Genesis Capital Funding. Thus it appears that Brigham financially controlled CCC and the Saginaw property.

14. In addition, mortgage documents for the second sale of the Saginaw property showed signatures of a Michael Chenot (hereafter Chenot) as representing CCC. A loan application to Loan Solution Inc. containing Chenot's information as a co-borrower, was

---

[1] Brigham had numerous other bank accounts at Chase Bank, but none of those other accounts were associated with CCC. Because this investigation is ongoing, it is possible that CCC held an account at another financial institution, but there is no evidence at this time indicating another account for CCC.

also used by Brigham to acquire the loan for the Saginaw property.[2] At the time, Chenot was a business partner with Brigham, but not a representative of CCC. Chenot advised that he did not provide Brigham authorization to use his name, signature nor credit to purchase the Saginaw property. Prior to and at the time the Saginaw property was purchased, Brigham never declared to Difranco, Brown or Pusateri of his association and relationship to CCC or Chenot. Thus, in order to assist in Brigham's efforts to obtain money from the investors, he misused Chenot's means of identification without lawful authority.

15. Based on his professional opinion, Pusateri believed the Saginaw property Broker Price Opinion (BPO) provided by Brigham was falsified and/or altered to show a higher worth in order to acquire the loan. Additionally, Pusateri believed that Brigham falsified his credit report. During the loan application process, Pusateri recalled that Brigham provided him a printed version of Brigham's credit report, but requested that Pusateri query Chenot's credit. Based on Pusateri's later discovery of Brigham's incarceration for financial crimes, Pusateri opined that Brigham's credit would not be near satisfactory as the printed credit report Brigham provided him suggested.

16. Brigham's loan for the Saginaw property went into foreclosure, as it was discovered that he never made payments on the mortgage and only collected the rent money from those renting the apartments on the property. Brigham advised Difranco and Brown that the lender was too quick to foreclose on him because of his race. Additionally, Brigham advised Difranco and Brown that his attorney filed a Lis Pendens on the property in order

---

[2] Loan Solution Inc. maintains a website at www.loan-solution.com. The website indicates that it provides loans for mortgages and other real estate investments. It therefore appears to finance or refinance debt secured by interests in real estate.

to protect his ownership.  It was later discovered that Brigham never had a Lis Pendens filed, never updated the units and lost the property to foreclosure without paying back Difranco and Brown.  In the end, Brigham purchased the Saginaw property from himself to secure a loan and continued to collect rent from the Saginaw property apartment tenants, until the property was foreclosed on.

17. Based on the above information, and my training, experience, and discussion with other agents, I believe probable cause exists to believe that evidence of the crimes of wire fraud, bank fraud, and identity theft will be found within the USPO Materials obtained from Brigham's residence.  The sale of real estate and applications for loans related to such sales typically generate substantial documentation in both hard copy and electronic format.  Moreover, since Brigham did not have a separate place of business, my training, experience, and discussion with other agents indicates that such records, along with other important financial records, will likely be found within the USPO Materials, which were seized from their home, by USPO personnel focused on obtaining financial documents in hard copy and electronic format.

### Gloria Giannini – Inheritance Fraud

18. Difranco and Brown met Giannini around June of 2016, through Brigham.  Brigham presented Difranco and Brown an opportunity to make money by assisting Giannini with moving a $200,000,000 inheritance from Spain through Canada into the U.S.   Giannini provided a notarized document outlining the agreement that consisted of Difranco and Brown providing Giannini $42,500 each to pay for fees and associated expenses related to the transfer of Giannini's inheritance to the United States.  In return, Difranco and Brown were to receive $127,500 each within one weeks' time.  Between June 2016 and

7

December 2017, Giannini provided several varying excuses as to the constant delays regarding the money transfer. Throughout this period Giannini would advise that she would need additional resources to pay for unexpected fees and expenses associated with the money transfer. In the summer of 2016, Brigham advised Difranco, Brown and Blair Johnson (hereafter Johnson) that Giannini needed an additional $30,000 to expedite the money transfer. In response, Johnson provided $30,000 to Giannini, the agreement being that his investment would return a total of $50,000. Between January 2017 and September 2017, Giannini requested additional funds from Difranco and Johnson for a variety of reasons. In response, Difranco wired Giannini an additional 2 payments that totaled $25,000 and Johnson an additional $17,000.

19. As the investors became more suspicious, Giannini provided Difranco and Brown a forged Wells Fargo wire transfer receipt. Giannini provided this document to establish proof that she had used Brown and Difranco's initial investment of $85,000 for the purpose Giannini previously stated. The aforementioned Wells Fargo wire transfer receipt showed a wire occurring on 6/16/2016 for the amount of $85,000 from Giannini's Wells Fargo Account to Bank of Nova Scotia account holder CIBC; CIBC is a Canadian Bank. Giannini's Wells Fargo bank records show that GIANNINI did wire $85,000 to an entity with a Bank of Nova Scotia account. However, the beneficiary name was Assante Furniture Limited (not CIBC). Additionally, the original wire transfer receipt included a memo from Giannini that stated: "Payment For Furniture". Difranco uncovered additional inconsistencies with Giannini's story and facts. Initially, Giannini claimed her inheritance was in Spain coming through, Canada. Later on the money was said to be in the United Kingdom, then in Brussels in the form of a bank instrument. Lastly, prior to

8

being arrested by USPO, Giannini claimed the money was in Hong Kong, China. Once Difranco realized she might be a victim of fraud, she uncovered other inconsistencies with information Giannini previously provided. One of the documents Giannini provided to Difranco as proof of her inheritance, was a letter from a La Caixa Bank in Spain that appeared to show Giannini had $220,000,000 with them, but needed Stamp Duty money to release it. La Caixa Bank changed its name in 2011 and the document Giannini provided was from 2016. Since 2011, La Caixa Bank became Caixabank and no longer uses the name La Caixa Bank.

20. Between January 2016 and December 2017, Giannini provided Difranco, Brown, and Johnson a number of excuses as to the money transfer delay, including additional fees that needed to be paid to the IRS, Department of Homeland Security, and the respective banks allegedly handling the money transfer. Giannini claimed to only deal with one banker in Fresno, CA and one bank Vice President in Palm Desert, CA. On multiple occasions Giannini would claim to Difranco that she was on her way to the bank to get the money, but would provide a number of excuses as to why she could not retrieve the money. Examples included: the banker got drunk at lunch, the banker could not come to the bank because of a landslide, and the banker's daughter got drunk and was he out looking for her.

21. According to Giannini's Wells Fargo bank records, Difranco, Brown and Johnson's wires and money deposits entered into Giannini's account. However, instead of paying fees associated with banks, IRS, Homeland Security, etc., as Giannini claimed, the majority of the funds were immediately wired to individuals and companies overseas including Canada, China and Malaysia.

9

22. Difranco and Brown advised that Claudia Igarik (hereafter Igarik), Brigham's girlfriend, conducted much of the email correspondence on Giannini's behalf. Also through conference calls with Brown, Giannini, Johnson and Difranco, Igarik and Brigham would vouch for Giannini and the existence of the $200,000,000. On August 25, 2017, Igarik claimed in an email to have viewed Giannini's $200,000,000 account balance online and that $10,000,000 of the funds were wired to Giannini's Wells Fargo Account under Atlas Industrial Resources Inc., for the purpose of paying back Brown, Johnson and Difranco. According to all Wells Fargo Account records associated to Giannini and Skordoulis, including Atlas Industrial Resources Inc., no such funds transfer occurred. During the period of January 2016 – January 2018, Giannini and Skordoulis' combined Wells Fargo account balances never exceed $150,000 at a given time.

23. Based on the above information, and my training, experience, and discussion with other agents, I believe probable cause exists to believe that evidence of the crimes of wire fraud and bank fraud will be found within the USPO Materials obtained from Giannini's and Brigham's residences. Financial transactions typically generate substantial documentation in both hard copy and electronic format. Moreover, since Giannini, Brigham, and Igarik did not have a separate place of business, my training, experience, and discussion with other agents indicates that such records, along with other important related transactions, will likely be found within the USPO Materials, which were seized from their homes, by USPO personnel focused on obtaining financial documents in hard copy and electronic format.

**Gloria Giannini – Bank Fraud**

24. On 12/4/2017, Giannini deposited Comerica Bank check# 1000013364, in the amount of $125,520.98, into her Wells Fargo Account# 8475792787. The check appeared to be made out to "Giannini Trust" from KP LLC. On June 7, 2018 I contacted KP LLC to inquire about the aforementioned check. KP LLC CEO Joe Atturio (hereafter Atturio) advised me that the check I was referring to was counterfeit and that Comerica was investigating the loss. Atturio advised me that they did not write a check to Giannini Trust. On June 7, 2018, I contacted a representative of Comerica regarding the aforementioned check fraud investigation. Comerica provided me with a scanned copy of the original and counterfeit checks. The original check from KP LLC was made out to Express Services Inc-WA (hereafter Express Services) in order to pay invoices for temporary employment services. The only difference between the check to Express Services and the check Giannini deposited, is that her name and home address were replaced with that of Express Services. According to Atturio, the original check was sent to a P.O. Box that was previously associated to Express Services, but was later discovered to have changed between the time KP LLC last sent invoice payments to Express Services at that address.

25. On June 21, 2018, I interviewed Wells Fargo Bank Manager Giovanny Hurtarte (hereafter Hurtarte). Hurtarte advised that on December 4, 2017, Giannini came into the Wells Fargo located at 1743 N. Sunrise Way, Palm Springs, CA and deposited a check for $125,520.98. Hurtarte assisted Giannini with this deposit based on the large amount. It was not until January 2018 that Hurtarte was notified by Comerica Bank that the aforementioned check was fraudulent.

11

26. Giannini's bank records show that after depositing the check for $125,520.98, Giannini proceeded to immediately wire $40,000 to Heng Sang Bank in China and used approximately $10,000 in checks and cash withdrawals. $50,000 of the illicit funds were withdrawn as cash and deposited to another Wells Fargo account associated with Giannini. Once Wells Fargo became aware of the check fraud, they seized the remaining funds in all accounts associated with Giannini and provided the retrieved funds back to Comerica Bank for the loss incurred. Giannini's bank records suggest that she used $49,143.03 of the proceeds from the check fraud before Wells Fargo seized her accounts.

27. Based on the above information, and my training, experience, and discussion with other agents, I believe probable cause exists to believe that evidence of the crimes of wire fraud and bank fraud will be found within the USPO Materials obtained from Giannini's residence. Financial transactions typically generate substantial documentation in both hard copy and electronic format. Moreover, since Giannini did not have a separate place of business, my training, experience, and discussion with other agents indicates that such records, along with other important related transactions, will likely be found within the USPO Materials, which were seized from their homes, by USPO personnel focused on obtaining financial documents in hard copy and electronic format.

### Conclusion

28. To date Difranco, Brown, and Johnson have yet to receive any monies in return for their respective investments with Brigham and Giannini. Based on the investigation to date in this case, and on my training and experience, I have probable cause to believe that Gloria Giannini committed violations of Title 18, United States Code, Section 1343 (Wire Fraud) and Title 18, United States Code, Section 1344 (Bank Fraud) and Clifford

12

Brigham committed violations of Title 18, United States Code, Section 1343 (Wire Fraud) Title 18, United States Code, Section 1344 (Bank Fraud), Title 18, United States Code, Section 1028(a)(7) (Identity Theft) and that there is evidence of such contained on the documents, computers, phones and thumb drive provided by USPO to the FBI, as described in Attachment B.

### Evidence Located on Computers

29. I submit that there is probable cause to believe records will be stored on the computer described in Attachment A, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few

13

examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

30. Based upon the facts and circumstances described above, there is probable cause to believe that evidence of the criminal violations previously described are maintained on a computer as described in Attachment B at the location described with particularity in Attachment A.

31. During the course of my investigation, I have consulted with FBI Computer Analysis Response Team (CART) member Alan Russell Schmidt regarding the aspects of properly retrieving and analyzing electronically stored data. Information Technology Specialist, Forensic Examiner (ITS/FE) Alan Russell Schmidt is employed as a CART Certified Digital Forensic Examiner and has been so employed since June 2006. Prior to working as a ITS/FE, ITS/FE Schmidt was employed as an Information Technology Specialist (ITS) for the FBI from approximately June 2003 to June 2006. ITS/FE Schmidt received a Bachelor's degree in Business Administration from the University of Phoenix in 1996. ITS/FE Schmidt was certified as a FBI Computer Analysis Response Team (CART) Digital Forensic Examiner in June 2006 and, additionally certified as a FBI CART Macintosh Forensic Examiner in May 2010. During ITS/FE Schmidt's employment with the FBI, ITS/FE Schmidt has conducted and participated in numerous investigations of criminal and national security violations and has undergone

14

continual training in the identification and investigation of digital evidence.

32. Based on his knowledge, ITS/FE Schmidt has advised me that to properly retrieve and analyze all electronic stored (computer) data, to document and authenticate such data, and to prevent the loss of data either from accidental or deliberate programmed destruction requires on-site and laboratory analysis by a qualified Digital Forensic Examiner (DFE). To effect such accuracy and completeness may require the seizure of all computer equipment and peripherals which may be interdependent, the software to operate the computer system, data security devices (including passwords and decryption keys), and related instruction manuals which contain directions concerning the operation of the computer system and software programs. This is because the peripheral devices, which allow users to enter or retrieve data from storage devices, vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It may be important that the computer system be re-configurable to accurately retrieve the evidence.

33. As part of his search of the computer system and peripherals, FBI DFE may need to make a verifiable duplicate image copy of the hard drive(s), backup media, floppy diskettes, disk cartridges, CD-ROMs, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks on which data was stored. A verifiable duplicate image copy is an exact copy of the storage media. This is necessary to accurately reproduce the documents on the storage devices and to preserve the integrity of the data. The search will then be conducted using the verifiable duplicate image copy. SRR has consented to the FBI retaining the original devices until

the conclusion of this matter.

34. Permission is requested for the FBI DFE to make a verifiable duplicate image copy of the above storage media and conduct a search of the computer systems, hardware, software and backup media for the specific items described in this affidavit and Attachment B. ITS/FE Schmidt has informed me that the FBI DFE will provide the investigating agent(s) only those documents and evidence which are set forth in the search warrant.

35. If, for technical reasons or volume of evidence, the FBI DFE cannot acquire a mirror image of computers and/or removable media on-site, authorization for removal of the computer, peripherals devices, and/or removable media is requested.

36. The terms "records", "documents", and "materials" as used above include all of the items of evidence more fully described in Attachment B in whatever form and by whatever means such records, documents, or materials, their drafts, or their modifications may have been created or stored, including, but not limited to any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any electrical, or magnetic form (such as tape recording, cassettes, compact disks); and/or any information on an electronic or magnetic storage device (such as floppy diskettes, hard drives, backup media, disk cartridges, CD-ROMs, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks); as well as printouts or readouts from any magnetic storage device.

37. As further described in Attachment B, this application seeks permission to locate not

16

only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises because:

d.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

e.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, and consulting with ITS/FE Schmidt, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional

17

information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it

18

relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

    f.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

    g.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    h.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

38. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that

reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### Search Procedure

39. In searching for data capable of being read, stored, or interpreted by a computer or storage device, law enforcement personnel executing the search warrant will employ the following procedure:

    i.   Law **enforcement** personnel (potentially including, but not necessarily limited to, computer personnel) will examine the digital device to determine if it contains any data that falls within the list of items to be seized as set forth in the warrant and in Attachment B.

    j.   Law enforcement personnel will use procedures designed to identify items to be seized under the warrant.  These procedures may include, without limitation, the use of a "hash value" library to exclude normal operating system files that do not need to be searched.  In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

    k.  If the original digital device was seized, law enforcement personnel will perform an initial search of the original digital device within a reasonable amount of time. If, after conducting the initial search, law enforcement personnel determine that an original digital device contains any data falling within the list of items to be

20

seized pursuant to this warrant, the government will retain the original digital device to, among other things, litigate the admissibility/authenticity of the seized items at trial, ensure the integrity of the copies, ensure the adequacy of chain of custody, and resolve any issues that potentially might be raised regarding changed conditions of the evidence.  If the government needs additional time to determine whether an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court.

l.   If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will: return that original digital device to its owner within a reasonable period of time if it can be lawfully possessed; seal any image previously made of the device; and not review the sealed image absent further authorization from the Court.

### Data to be Seized

40. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that, in order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize, image, copy, and/or search the following items, subject to the procedures set forth herein:

m.   Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

n.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware,

21

storage devices, or data to be searched;

o. Any physical keys, encryption devices, dongles, or similar physical items which are necessary to access the computer equipment, storage devices, or data;

p. Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data;

q. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, that show the actual user(s) of the computer or digital device during any time period in which the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the Device, MAC IDs and/or Internet Protocol addresses used by the Device; email, instant messages, and electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device);

r. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device; and

s. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital

22

device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this Attachment.

### Inventory and Return

41. With respect to the seizure of electronic storage media or the seizure or imaging of electronically stored information, the search warrant return to the Court will describe the physical storage media that were seized or imaged.

### Manner of Execution

42. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

### Prior Efforts to Obtain Evidence

43. The government has made the following prior efforts in other judicial form to obtain evidence sought in this warrant:  NONE.

//

//

//

//

//

//

//

//

//

23

**Conclusion**

44. Based on the forgoing, there is probable cause to search for and seize items that constitute evidence of ownership, the commission of a criminal offense, and contraband, the fruits of crime, and things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, as described in this affidavit, for violations of Title 18, United States Code, Section 1343 (Wire Fraud), Title 18, United States Code, Section 1344 (Bank Fraud),  and Title 18, United States Code, Section 1028(a)(7) (Identity Theft).

Steven Kornaros
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this ____ C ____ day of October, 2018.

The Honorable Erica P. Grosjean
United States Magistrate Judge

Approved as to form:

Michael Tierney
Assistant United States Attorney

24

# ATTACHMENT A

## Description of items to be Searched:

All items to be searched were provided by the United States Probation Office and are located at the FBI office in Fresno, CA (7815 N. Palm Ave, Suite 320, Fresno, CA 93711) and the FBI Office in Roseville, CA (2001 Freedom Way, Roseville, CA 95678). The following items to be searched are as follows:

1. 9 boxes containing miscellaneous documents
2. Check books and single checks from various banks
3. 1- Dell Precision T3500 Computer, Model: DCTA, S/N: 8ONFTR1
4. 1- Toshiba Satellite Laptop, P55W-C5200, S/N: 3F103743S
5. 1- Samsung cellphone, black in color, S/N: RV8H60WS74M
6. 1- Motorola cellphone, gold in color, model: XT1765, S/N: NA, IMEI: 355674080787834
7. 1- Samsung cellphone, black in color, model: SM-J327A, S/N: R28J80JQ6YN (4)
8. Motorola cellphone, black in color, model: XT1045, S/N: N/A, IMEI: 354997057044900
9. Nokia cellphone, white in color, model: RM-975, S/N: N/A, IMEI: 356485060133082
10. 1- San disk Cruzer Thumbdrive, 32GB, S/N: BM1605252428
11. Samsung flip phone, black in color, Model: SPH_M270
12. iPhone cellphone, black in color, 8GB, model:A1241
13. USB Flash Drive, Cruzer Switch TAD SDCZ52 (B) 8 GB, red and black in color with the letters and numbers AC1 labeled on one side and Serial Number: BI140523309D labeled on the other side.
14. USB Flash Drive, Lexar LJDSS0 16 GB, blue and white in color with the letters and number AC2 labeled on one side and Serial Number: 34246-16GBVA12155 labeled on the other side.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Sections 1343, 1344 and 1028 from April 1, 2016 to the present, more particularly described as:

1.  The following records, documents, files, or materials, consisting of:

    a.  All documentation or records evidencing communication between GIANNINI, BRIGHAM, DIFRANCO, BROWN and/or JOHNSON to include but not limited to, email communications and text messages.

    b.  Financial documents or records relating to the payment of GIANNINI and/or BRIGHAM, including but not limited to bank statements, cashier's checks, checks, deposits slips, wire transfer information and receipt information.

    c.  Documents or records evidencing of any banking documents, altered, or otherwise found on the computer.

2.  COMPUTERS: In searching the location, the following protocol will be utilized when searching or seizing electronic devices or media:

    a.  In executing the warrant, the government will begin by ascertaining whether all or part of the search of computers or other electronic equipment or media that is authorized in this warrant can be reliably completed at the site within a reasonable time. If the search can be so completed on site, the government will remove a

computer or other piece of electronic equipment from the site only if necessary to preserve evidence or if the removed item is contraband or is a forfeitable instrumentality or fruit of the crime.

b. If the government determines that a reliable search as authorized in this warrant cannot be completed at the site within a reasonable period, the government will proceed to determine whether all or part of the authorized search can be completed by making mirror images of, or in some other manner duplicating, the contents of any computer or other electronic device, then completing the search of those contents off-site, e.g., at a law enforcement lab.

c. The government will remove from the search location a computer or other electronic device only if the item cannot be searched reliably on site or by mirror-imaging or by otherwise duplicating its contents for off-site examination – unless removing the item is necessary to preserve evidence or the item is contraband or is a forfeitable instrumentality or fruit of the crime. The government also may remove the computer or other electronic device from the search location to reliably and efficiently complete an off-site search of the item. Further, within ten (10) calendar days of the removal, the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents.

d. The computer or electronic media removed from the site shall be returned within fourteen (14) days unless, under the law, the government may retain it for use as evidence or it is contraband a forfeitable instrumentality or fruit of a crime, or unless such date is further extended by the Court. The government may continue

to utilize the retained images or other duplicates of electronic media to recover items identified in the warrant after returning the computers and electronic media removed from the site. The images may be utilized to restore computers and electronic media or to search the images with forensic software.

e.  In conducting the search authorized by this warrant, whether on site or off site, the government must make all reasonable efforts to use methods and procedures that will locate and examine only those categories of files, documents or other electronically stored information that are identified in the warrant.  The government may restore the image of original media and utilize the assistance of agents familiar with the case when searching for electronically stored information.

f.  The terms of this warrant do not limit or displace any person's right to file a motion for return of property under Fed. R. Crim. P. 41(g).  Nor does the issuance of this warrant preclude any person with any interest in any seized item from asking the government to return the item or, where useful, a copy of it.

g.  The government will promptly notify the Court in writing if a dispute arises about rights or interests in any seized or searched item or any data or information contained in any searched or seized item.  The government will deliver a copy of such notification to any person known to assert any such right or interest.

3.  Within the limitations described above and as part of the seizure of the aforementioned items, the searching agents may remove from the premises to be searched all computer hardware and related equipment, devices, disks, tapes, and other items, and all manuals or written information relating to the operation of the computer hardware, software, and related equipment , as follows:

a. Computer hardware and computer related equipment;

b. Computer software and all other electronic, magnetic, or other media capable of being read or interpreted by a computer or its related components, and all information contained therein;

c. Electronically stored communications;

d. Computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data;

e. Physical keys, encryption devices, and similar physical items that are necessary to gain access to computer programs, data , or other information into a readable or usable form;

f. Electronic devices such as Personal Digital Assistants (PDAs) or electronic organizers;

g. Routers, bridges, or hubs, and all manuals associated with such equipment; and

h. Computer related documentation consisting of written, recorded, printed or electronically store material which explain or illustrate how to configure or use computer hardware, software, or other related items.

4. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant in Item 1 (hereinafter known as "COMPUTER"):

a. Evidence of who used, owned, or controlled the COMPUTER at the time the items in Item 1 were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history,

user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.   Contextual information necessary to understand the evidence described in this attachment.

SEALED   ISSUED

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| Items seized by the United States Probation Office | ) |
| provided to the FBI regarding Gloria Giannini and Cifford | ) |
| Brigham. | ) |

Case No.

1: 18 SW 00 3 9 4 EPG

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____Eastern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____*14 days*_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   10/5/18 at 11:00am

_____
*Judge's signature*

City and state:    Fresno, CA

Honorable Erica P. Grosjean, US Magistrate Judge
*Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# **ATTACHMENT A**

## **Description of items to be Searched:**

All items to be searched were provided by the United States Probation Office and are located at the FBI office in Fresno, CA (7815 N. Palm Ave, Suite 320, Fresno, CA 93711) and the FBI Office in Roseville, CA (2001 Freedom Way, Roseville, CA 95678). The following items to be searched are as follows:

1. 9 boxes containing miscellaneous documents
2. Check books and single checks from various banks
3. 1- Dell Precision T3500 Computer, Model: DCTA, S/N: 8ONFTR1
4. 1- Toshiba Satellite Laptop, P55W-C5200, S/N: 3F103743S
5. 1- Samsung cellphone, black in color, S/N: RV8H60WS74M
6. 1- Motorola cellphone, gold in color, model: XT1765, S/N: NA, IMEI: 355674080787834
7. 1- Samsung cellphone, black in color, model: SM-J327A, S/N: R28J80JQ6YN (4)
8. Motorola cellphone, black in color, model: XT1045, S/N: N/A, IMEI: 354997057044900
9. Nokia cellphone, white in color, model: RM-975, S/N: N/A, IMEI: 356485060133082
10. 1- San disk Cruzer Thumbdrive, 32GB, S/N: BM1605252428
11. Samsung flip phone, black in color, Model: SPH_M270
12. iPhone cellphone, black in color, 8GB, model:A1241
13. USB Flash Drive, Cruzer Switch TAD SDCZ52 (B) 8 GB, red and black in color with the letters and numbers AC1 labeled on one side and Serial Number: BI140523309D labeled on the other side.
14. USB Flash Drive, Lexar LJDSS0 16 GB, blue and white in color with the letters and number AC2 labeled on one side and Serial Number: 34246-16GBVA12155 labeled on the other side.

# ATTACHMENT B

## ITEMS TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Sections 1343, 1344 and 1028 from April 1, 2016 to the present, more particularly described as:

1. The following records, documents, files, or materials, consisting of:

    a. All documentation or records evidencing communication between GIANNINI, BRIGHAM, DIFRANCO, BROWN and/or JOHNSON to include but not limited to, email communications and text messages.

    b. Financial documents or records relating to the payment of GIANNINI and/or BRIGHAM, including but not limited to bank statements, cashier's checks, checks, deposits slips, wire transfer information and receipt information.

    c. Documents or records evidencing of any banking documents, altered, or otherwise found on the computer.

2. COMPUTERS: In searching the location, the following protocol will be utilized when searching or seizing electronic devices or media:

    a. In executing the warrant, the government will begin by ascertaining whether all or part of the search of computers or other electronic equipment or media that is authorized in this warrant can be reliably completed at the site within a reasonable time. If the search can be so completed on site, the government will remove a

computer or other piece of electronic equipment from the site only if necessary to preserve evidence or if the removed item is contraband or is a forfeitable instrumentality or fruit of the crime.

b.  If the government determines that a reliable search as authorized in this warrant cannot be completed at the site within a reasonable period, the government will proceed to determine whether all or part of the authorized search can be completed by making mirror images of, or in some other manner duplicating, the contents of any computer or other electronic device, then completing the search of those contents off-site, e.g., at a law enforcement lab.

c.  The government will remove from the search location a computer or other electronic device only if the item cannot be searched reliably on site or by mirror-imaging or by otherwise duplicating its contents for off-site examination – unless removing the item is necessary to preserve evidence or the item is contraband or is a forfeitable instrumentality or fruit of the crime.  The government also may remove the computer or other electronic device from the search location to reliably and efficiently complete an off-site search of the item.  Further, within ten (10) calendar days of the removal, the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents.

d.  The computer or electronic media removed from the site shall be returned within fourteen (14) days unless, under the law, the government may retain it for use as evidence or it is contraband or a forfeitable instrumentality or fruit of a crime, or unless such date is further extended by the Court.  The government may continue

to utilize the retained images or other duplicates of electronic media to recover items identified in the warrant after returning the computers and electronic media removed from the site. The images may be utilized to restore computers and electronic media or to search the images with forensic software.

e.  In conducting the search authorized by this warrant, whether on site or off site, the government must make all reasonable efforts to use methods and procedures that will locate and examine only those categories of files, documents or other electronically stored information that are identified in the warrant.  The government may restore the image of original media and utilize the assistance of agents familiar with the case when searching for electronically stored information.

f.  The terms of this warrant do not limit or displace any person's right to file a motion for return of property under Fed. R. Crim. P. 41(g).  Nor does the issuance of this warrant preclude any person with any interest in any seized item from asking the government to return the item or, where useful, a copy of it.

g.  The government will promptly notify the Court in writing if a dispute arises about rights or interests in any seized or searched item or any data or information contained in any searched or seized item.  The government will deliver a copy of such notification to any person known to assert any such right or interest.

3.  Within the limitations described above and as part of the seizure of the aforementioned items, the searching agents may remove from the premises to be searched all computer hardware and related equipment, devices, disks, tapes, and other items, and all manuals or written information relating to the operation of the computer hardware, software, and related equipment , as follows:

    a. Computer hardware and computer related equipment;

    b. Computer software and all other electronic, magnetic, or other media capable of being read or interpreted by a computer or its related components, and all information contained therein;

    c. Electronically stored communications;

    d. Computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data;

    e. Physical keys, encryption devices, and similar physical items that are necessary to gain access to computer programs, data , or other information into a readable or usable form;

    f. Electronic devices such as Personal Digital Assistants (PDAs) or electronic organizers;

    g. Routers, bridges, or hubs, and all manuals associated with such equipment; and

    h. Computer related documentation consisting of written, recorded, printed or electronically store material which explain or illustrate how to configure or use computer hardware, software, or other related items.

4. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant in Item 1 (hereinafter known as "COMPUTER"):

    a. Evidence of who used, owned, or controlled the COMPUTER at the time the items in Item 1 were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history,

user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  Contextual information necessary to understand the evidence described in this attachment.